### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUFFIELD BOARD OF ED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-1026 (JCH) |
| v. | : | |
| | : | |
| L.Y. et al., | : | JANUARY 7, 2014 |
| Defendants. | : | |

### RULING RE: PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. No. 43) AND DEFENDANTS' MOTION FOR SUMMARY JUDMGENT ON THE ADMINISTRATIVE RECORD (Doc. No. 44)

## I.    INTRODUCTION

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., plaintiff Suffield Board of Education ("Suffield") brings this appeal of a final decision of a State of Connecticut Special Education Hearing Officer (the "Hearing Officer").  Defendants—the student S.Y. ("S") and his parents (collectively, "Mr. and Mrs. Y" or the "parents")—filed a separate appeal of the Hearing Officer's decision in this court.  The two actions were consolidated.

The parties cross-move for judgment on the administrative record.  For the reasons set forth below, the court **GRANTS in part and DENIES in part** Suffield's Motion (Doc. No. 43) and **DENIES** the parents' Motion (Doc. No. 44).

## II.    BACKGROUND

### A.    Statutory Framework

Congress enacted the IDEA to ensure that a free appropriate public education ("FAPE") is available to all children with disabilities and that the rights of such children and their parents are protected.  See 20 U.S.C. § 1400(d)(1)(A) & (B); M.H. v. New York City Dep't of Educ., 685 F.3d 217, 223 (2d Cir. 2012).  The IDEA offers federal funds to

states that develop plans to assure the availability of FAPE to resident children with disabilities.  See 20 U.S.C. § 1412(a)(1)(A); M.H., 685 F.3d at 223 (citing Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003)).  "To meet the IDEA's requirements, a school district's program must provide special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits."  M.H., 346 F.3d at 224 (citations, alterations, and internal quotation marks omitted).  Such services must be administered in the least restrictive environment ("LRE") according to an individualized education program ("IEP"), which the district must implement each year for each student with a disability.  Id. (citation omitted).

By "set[ting] out the child's present educational performance, establish[ing] annual and short-term objectives for improvements in that performance, and describ[ing] the specially designed instruction and services that will enable the child to meet those objectives," id., IEPs constitute "the centerpiece of the IDEA's educational delivery system," id. (quoting D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 507 (2d Cir. 2006)).  To be adequate, an IEP need not provide every "special service necessary to maximize each handicapped child's potential."  Id.  (citations omitted).  However, the IEP "must be likely to produce progress, not regression, and must afford the student with an opportunity greater than mere trivial advancement."  Id. (citation, alterations, and internal quotation marks omitted).

The IEP is created by a group that includes, among others, a representative of the local educational agency, teachers, the child's parents, and an individual able to interpret "the instructional implications of evaluation results."  20 U.S.C. § 1414(d)(1)(B).

In Connecticut, that group is referred to as the child's Planning and Placement Team ("PPT").  See Conn. Gen. Stat. § 10-76ff.

Where the parents and district disagree about whether a given IEP provides FAPE to the child, both state and federal law provide for "an impartial due process hearing" before a state administrative agency.  See 20 U.S.C. § 1415(f); 34 C.F.R. § 300.514; Conn. Gen. Stat. § 10-76h(a)(1).  If the parents or the district is dissatisfied with the final decision of the administrative agency, either party may institute a civil action seeking judicial review of that decision.  See 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516(a).  Where the parents have enrolled their child, in the interim, in a private school without the district's consent and at their own expense, the district may be ordered to reimburse the cost of the private program, if the hearing officer or reviewing court ultimately finds that the IEP does not provide FAPE to the student.  See 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.516(c)(3).

B.    Prior to the 2011-2012 School Year

S is eligible for special education and related services under the IDEA based on diagnosed disabilities affecting his cognitive, language, motor, sensory, social, and academic performance.  See Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on Admin. R. ("Pl.'s Mem.") (Doc. No. 43-1) at 3; Defs.' Mem. in Supp. of Defs.' Mot. for Summ. J. on Admin. R. ("Defs.' Mem.") (Doc. No. 44-1) at 1; Hearing Officer's Final Decision and Order ("Final Decision") at 2-3.  In 2009, at the request of S's parents, Dr. Cristina Ciocca prepared an extensive written report after conducting a neuropsychological evaluation of S and observing S at Suffield's school.  See Pl.'s Mem. at 4; Def.'s Mem. at 4; Final Decision at 4.  In her 2009 report, Dr. Ciocca made several recommendations, including preferential seating for S, an intensive structured language-based program within a

small classroom environment, building frequent academic success to enhance self-esteem, involvement with peers of similar disabilities, extended school year ("ESY") services, and continued extensive outpatient services in occupational, physical, and speech therapy.  See Pl.'s Mem. at 4-5; Defs.' Mem. at 5-6; Final Decision at 4; B-73 at 28-30.

For the summer of 2009, the parents enrolled S at a private special education school—Ben Bronz Academy ("BBA")—at their own expense.  See Defs.' Mem. at 6.  According to the testimony of the Executive Director, BBA's primary focus is on students with language processing-based learning disabilities, such as dyslexia, and its main success is with such students.  See Spence Test., Hr'g Tr. (Mar. 6, 2012) at 18-19.  However, BBA admits a broader range of students with disabilities.  Id.  The average time for students to attend BBA is 2.4 years.  Id. at 20.  BBA works with districts to plan for students' return to district schools and sometimes participates in PPT meetings.  Id. at 20-22.

At a PPT meeting in September 2009, Suffield rejected the request by S's parents for placement at BBA during the 2009-2010 school year.  See Defs.' Mem. at 6.  Rather than accept the IEP provided by Suffield, the parents unilaterally placed S at BBA.  See Pl.'s Mem at 4.  Thereafter, the parties reached a settlement covering the 2009-2010 and 2010-2011 school years (the "Settlement").  See B-76.  In the Settlement, Suffield agreed to pay a lump sum for each of the two extended school years (September through August) and to convene a PPT meeting in May 2010 to design S's 2010-2011 IEP, which IEP the parents could (and did) reject.  Id. ¶¶ 2, 5.  In

exchange, the parents agreed to release all claims pursuant to the IDEA through August 30, 2011.  Id. ¶¶ 2, 5, 8.

     C.    The 2011-2012 School Year

In June 2011, Suffield convened a PPT to design S's IEP for the 2011-2012 school year, which IEP would become effective in September 2011, after the lapse of the period covered by the Settlement.  Prior to the meeting, Suffield obtained progress reports and evaluation information from BBA and spoke with Mrs. Y, who conveyed that S had not been receiving any educational services outside of BBA.  See Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 123-31.  An updated report by Dr. Ciocca requested by S's parents was also received by Suffield shortly beforehand.  See id. at 131-32.  In this March 2011 report, Dr. Ciocca made various recommendations, including continued placement at BBA, continued use of positive enforcers to build confidence, ESY services, supplemental social skills training, additional support and tutoring in mathematics, and extracurricular activities and social programs to provide socialization and social skills practice. See B-86 at 25-26; Final Decision at 6.

Legal counsel for the parents and Suffield attended the June 2011 meeting.  See B-89 at 1.  However, neither Suffield nor the parents invited Dr. Ciocca or staff from BBA to attend, see Pl.'s Mem. at 6, and neither Dr. Cioccca nor any BBA staff were present at the meeting, see B-89 at 1.  See also Pl.'s Mem at 6; Defs.' Mem. at 12-13.

At the June 2011 meeting, PPT members reviewed:  (1) S's educational needs from the period of his last attendance at Suffield schools (in the 2008-2009 school year); (2) information received prior to the PPT meeting, including Dr. Ciocca's updated 2011 neuropsychological evaluation and the parents' information regarding services being provided to S outside BBA; and (3) reports from BBA on S's current level of functioning.

<u>See</u> Pl.'s Mem. at 6; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 120, 130; Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 122-23, 131-36; Kolodziey Test., Hr'g Tr. (Mar. 12, 2012) at 37, 41-42.

The PPT also requested permission to obtain additional testing concerning the need for an FM system and for speech, occupational, and physical therapy services. <u>See</u> Pl.'s Mem. at 6-7; Defs.' Mem. at 12-13; B-89 at 2-3; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 108-09; Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 122-23, 137-38.  S had previously been identified as needing the latter services, and the PPT did not have evaluations contradicting the ongoing need for such services.  <u>See</u> Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 137-38.  Furthermore, there were discrepancies in the BBA testing documentation, and the PPT felt that it could use additional evaluations to learn more about S's current needs in order to refine the IEP learning objectives.  <u>Id.</u> at 127-33, 137-38.

The parents withheld consent to the additional testing on the ground that S was exhausted from extensive testing immediately prior to the PPT.  <u>See</u> Defs.' Mem at 13; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 92-93.  Suffield did not file for a due process hearing to override the parents' refusal of consent.  <u>See</u> Final Decision at 12.

At the June 2011 meeting, the PPT updated S's IEP based on the available information.  <u>See</u> Pl.'s Mem. at 6; B-89 at 2-3; Kolodziey Test., Hr'g Tr. (Mar. 12, 2012) at 37.  The PPT recommended, <u>inter alia</u>:  speech, occupational, and physical therapy services; use of an FM system; academic assessment by Suffield; continued use of Cyberslate—a program S had used at BBA, but not previously at Suffield; social skills services; resource room for organizational skills; adult assist in science and social

6

studies; and an incentive program.  See B-89 at 2.  The PPT determined that the IEP could be implemented within Suffield Public Schools.  See id. at 3.  The parents rejected the IEP, indicating that they would file for a due process hearing and would unilaterally place S at BBA for the following school year.  See Pl.'s Mem. at 7; B-89 3.

       D.    Due Process Hearing

Pursuant to the IDEA, the parents requested a due process hearing in August 2011, to seek placement at BBA during the 2011-2012 school year.  See B-91.  In response, Suffield requested that the Hearing Officer dismiss the parents' claim regarding the appropriateness of the June 2011 IEP on the ground that they had withheld consent to additional testing or, in the alternative, that the Hearing Officer order such testing and convene a PPT to modify the IEP based on the evaluations.  See Pl.'s Mem. at 8-9.  In December 2011, the Hearing Officer ordered the additional testing requested by Suffield.  See Hr'g Tr. (Dec. 14, 2011) at 28-33.  A PPT meeting was convened in February 2012, to update S's IEP in light of this information.  See B-104. The subsequent testing confirmed S's need for speech, occupational, and physical therapy services.  See B-100 at 7; B-102 at 3; B-103 at 2; and B-104 at 2.  The audiologist recommended a 4-week trial with an FM system.  See B-101 at 2.

In the Hearing Officer's Final Decision, issued in May 2012, the Hearing Officer found that Suffield needed updated assessments to plan the June 2011 IEP.  See Final Decision at 7.  On that basis, as well as on the basis that the IEP lacked a transition program, he determined that Suffield's June 2011 IEP was inappropriate.  See Final Decision at 11-12.  The Hearing Officer also found, however, that BBA did not provide speech, occupational, and physical therapy services, id. at 5; that BBA could not provide the additional mathematics instruction required by S during the school day, id.

at 6; and that S's testing showed regression in some areas, id. at 7. On that basis, the

Hearing Officer determined that placement at BBA was inappropriate and that Suffield

was not responsible for such placement as of September 2011. Id. at 12-14. In

addition, the Hearing Officer directed Suffield to convene a PPT meeting and to provide

a 6-week ESY program to be completed prior to the start of the 2012-2013 school year.

Id. at 14.

       E.    Supplement to the Administrative Record

Although both parties moved for judgment on the administrative record, the

parents had previously supplemented the administrative record with the following

materials produced subsequent to, and as a result of, the Hearing Officer's Final

Decision: (1) S's IEP from June 2012; (2) S's IEP from August 2012; and (3) the report

of a mathematics assessment conducted in August 2012. See Doc. No. 38. Neither

party substantially relies on this new evidence.

## III.   STANDARD OF REVIEW

Under the IDEA, the responsibility for providing FAPE to a child falls to the state.

M.H., 685 F.3d at 244 ("[T]he purpose of the IDEA is to provide funding to states so that

they can provide a decent education for disabled students consistent with their

traditional role in educating their residents." (citing Bd. of Educ. of Hendrick Hudson

Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 208 n.30 (1982))).

Determining the appropriateness of an IEP and of alternative private placement "rests in

the first instance with [the state's] administrative hearing and review officers." Id. at 240

(quoting Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir.1998)). The

role assigned to federal courts in appeals of such officers' decisions is, therefore,

"circumscribed." Id. (citations and internal quotation marks omitted).[1]

The court "must engage in an independent review of the administrative record

and make a determination based on a 'preponderance of the evidence.'" Id. (citing

Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)).  The court,

however, should refrain from substituting its "own notions of sound educational policy

for those of the school authorities." Rowley, 458 U.S. at 206.

In this Circuit, the standard of review requires more than reviewing the hearing

officer's decision merely for clear error, but it stops "well short of complete de novo

review." M.H., 685 F.3d at 244 (quoting, with approval, Lenn v. Portland Sch. Comm.,

998 F.2d 1083, 1086-87 (1st Cir. 1993)).  The level of judicial deference paid to the

state's administrative determinations depends on the extent to which the determinations

are persuasive, well-reasoned, and based on greater familiarity with the evidence and

witnesses.  Id.  "But the district court's determination of the persuasiveness of an

administrative finding must also be colored by an acute awareness of institutional

competence and role." Id.  Thus, greater deference will be accorded to determinations

regarding substantive adequacy and appropriate educational methodology than to those

---

[1] Because Rule 56 is "the most pragmatic procedural mechanism" for resolving IDEA actions, Wall by Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996), federal court review of administrative decisions by state hearing officers typically occurs in the context of motions for summary judgment.  Nevertheless, "the procedure is in substance an appeal from an administrative determination," regardless of whether that procedure is styled as "summary judgment" under Rule 56. M.H., 685 F.3d at 226.

In such an appeal, the focus of the court's inquiry is not on the existence of disputed issues of material fact, as it would be for summary judgment purposes generally, but on whether the preponderance of the evidence "establishes that there has been compliance with the IDEA's processes and that the child's educational needs have been appropriately addressed." Wall by Wall, 945 F. Supp. at 508.  Hence, in the context of IDEA actions, it is not important whether a party is the moving or nonmoving party under Rule 56. Id.  Nor is it necessary for the parties to submit Local Rule 56(a) statements. T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).

regarding compliance with IDEA procedures or objective indications of a student's

progress.  Id.  Likewise, greater deference to the hearing officer's decision is warranted

where the court's review is grounded solely in the administrative record.  See id.;

Gagliardo, 489 F.3d at 113.

## IV.   DISCUSSION

The present appeal raises the same three issues presented to the Hearing

Officer:  (1) whether the June 2011 IEP provides S with FAPE; (2) whether unilateral

placement of S at BBA was appropriate; and (3) whether Suffield should bear the cost

of such placement, as of September 2011.  See Final Decision at 1.  With respect to the

first issue, Suffield moves the court to overturn the Hearing Officer's determination that

the June 2011 IEP does not provide S with FAPE.  With respect to the second and third

issues, the parents move the court to overturn the Hearing Officer's determination that

Ben Bronz is inappropriate, to award tuition reimbursement for the 2011-2012 school

year, and to order placement of S at BBA.

In determining entitlement to tuition reimbursement, courts in this Circuit engage

in a three-step process.  See A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent.

Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (citing Cerra v. Pawling Cent. Sch. Dist.,

427 F.3d 186, 192 (2d Cir. 2005)).  The court asks, first, "whether the state has

complied with the procedures set forth in the IDEA," id., and, second, "whether the

proposed IEP is substantively appropriate in that it is 'reasonably calculated to enable

the child to receive educational benefits,'" id. (quoting Rowley, 458 U.S. at 206-07).

Only if the first two inquiries uncover a procedural or substantive deficiency in the IEP

proposed by the district will the court proceed to ask, third, "whether the private

schooling obtained by the parents is appropriate to the child's needs."  Id.  At this last

stage, the reasonableness of the parents' actions is relevant, among other equitable factors, in fashioning appropriate relief.  Id.; see also Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter, 510 U.S. 7, 16 (1993).

A.    Compliance with IDEA Procedures

The Hearing Officer determined that there were no procedural violations in the promulgation of the June 2011 IEP.  See Final Decision at 11.  In particular, the Hearing Officer concluded that Suffield had complied with all notice requirements and that the parents had attended all PPT meetings, including the June 2011 meeting, at which they were represented by counsel.  Id.

The parents claim that the Hearing Officer erred in this part of his Final Decision, and that their opportunity for meaningful participation in the PPT was denied, because Suffield had allegedly predetermined that S would be placed within Suffield Public Schools and not at BBA.  See Defs.' Mem. at 19 (citing Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840 (6th Cir. 2004)).  The record does not support the parents' allegation.  The sole evidence adduced by the parents—namely, the testimony of Suffield's Director of Pupil Services, Dianna Kolodziey—indicates that, at the June 2011 meeting, the PPT discussed a continuum of possible placements, which included S's placement at BBA as well as placements within Suffield Public Schools.  See Kolodziey Test., Hr'g Tr. (Mar. 12, 2012) at 40-42.  That meeting appears to have been contentious and characterized by considerable back and forth between counsel.  See, e.g., id. at 42-43.  That the PPT did not adopt the parents' position, however, does not mean that their position was not considered and that private placement was foreclosed prior to the PPT's designing S's IEP.  Moreover, nothing in the record suggests that Suffield has a policy of automatically rejecting private placements for students with

11

disabilities.  Suffield has had, in fact, other students in outside placements at BBA.  See Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 111-12.

Based on the court's review of the administrative record, the parents have failed to show, by a preponderance of the evidence, the sort of close-mindedness on Suffield's part from which it would be reasonable to infer that the parents had been unable to voice their concerns.  See, e.g., T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 (2d Cir. 2009).  The court, thus, affirms the Hearing Officer's determination concerning the absence of procedural violations and proceeds to the second inquiry.

B.     Substantive Appropriateness of the June 2011 IEP

"An IEP is a snapshot, not a retrospective."  R.E. v. New York City Dep't of Educ., 694 F.3d 167, 185-86 (2d Cir. 2012) (quoting, with approval, Roland M. v. Concord Sch. Comm., 910 F.3d 983, 992 (1st Cir. 1990)).  Therefore, the substantive appropriateness of the IEP "must be evaluated prospectively as of the time of its drafting."  Id. at 186.  To be substantively appropriate, an IEP must be "likely to produce progress, not regression, and must afford the student with an opportunity greater than mere trivial advancement."  M.H., 685 F.3d at 224 (citations, alterations, and internal quotation marks omitted).  The IDEA requires "the door of public education [to] be opened for a disabled child in a 'meaningful' way."  Walczak, 142 F.3d at 130.  However, it does not guarantee "everything that might be thought desirable by loving parents."  Id. at 132.

The Hearing Officer determined that the June 2011 IEP did not provide S with the opportunity for meaningful progress on two grounds:  (1) the PPT did not have adequate information on which to base S's IEP at the June 2011 meeting; and (2) S's IEP did not

provide ESY services in the form of a summer transition program.  See Final Decision at 7, 11-12.  The court addresses each ground in turn.

>    1.    Lack of Adequate Information

Both parties argue—contrary to the Hearing Officer's conclusion, see id.—that the PPT had adequate information on which to base S's IEP at the time of the June 2011 meeting.  See Pl's Mem. at 18-20; Defs.' Opp'n to Pl.'s Mot. ("Defs.' Opp'n") (Doc. No. 49) at 8 ("With regard to evaluative data, the PPT had adequate and sufficient data and testing information to develop an IEP.").  The court agrees and, therefore, overturns the Hearing Officer's conclusion with respect to this issue.

At the time of the June 2011 meeting, the PPT had progress reports and testing results from BBA regarding S's current levels of performance, an updated report from Dr. Ciocca furnished by the parents, and the results of testing conducted as part of the last triennial evaluation in 2009.  See B-84; B-85; B-86; Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 122-33.  Admittedly, S had not attended Suffield Public Schools for two years, Suffield had not conducted site observations of S at BBA, and no BBA staff were present at the PPT meeting.  See Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 89-92. However, Kolodziey, who ran the meeting, had personal knowledge of BBA and, in advance of the meeting, discussed S's progress with BBA's principal.  See Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 122-33; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 90. Kolodziey also followed up with BBA to seek clarification of discrepancies in S's testing results and contacted the parents for updates regarding outside services provided to S. See Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 127-31.  Such evidence is inconsistent with the Hearing Officer's conclusion that the PPT lacked adequate information.

It is true that, at the June 2011 meeting, the PPT requested additional testing. See B-89 at 2-3.  As the Hearing Officer noted, the parents withheld their consent to this testing, and Suffield did not file for a due process hearing.  See Final Decision at 11-12. However, the Hearing Officer's finding that Suffield "needed updated assessments on related services to plan the IEP," id. at 7, is not supported by the preponderance of evidence in the administrative record.   According to both parties, such assessments were unnecessary in designing an appropriate IEP, even if they would have aided the PPT in determining the correct levels of related services, such as speech, occupational, and physical therapy services, which had not been provided at BBA and were tested only at the last triennial evaluation in 2009.  See Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 136-38.  Absent conflicting post-2009 data, it was reasonable for the PPT to rely on the data from 2009 indicating S's need to receive these services and, in reliance on this (the most recent available) data, to recommend such services, along with reevaluations to enable appropriate modifications.  Id.

The Hearing Officer's legal determination that the absence of reevaluations regarding these services rendered the June 2011 IEP unlikely to confer substantial educational benefits on S is entitled to less deference because the Hearing Officer provides no reasoning and cites no specific evidence to support that determination.  The Hearing Officer cites generally to the IEP itself as well as the testimony of Kolodziey and Mrs. Y.  See Final Decision at 7.  That evidence, however, is more consistent with the parties' own conclusion that, while newer data for related services may have been useful, it was not necessary.  See Kolodziey Test., Hr'g Tr. (Mar. 12, 2012) at 58; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 91; see also Pl.'s Mem. at 18-20; Defs.' Opp'n at 8.

14

The need for adequate information on which to base S's IEP did not require Suffield to gather all information that might be useful prior to the PPT meeting. <u>See</u> <u>Mackey v. Bd. of Educ. for Arlington Cent. Sch. Dist.</u>, 373 F. Supp. 2d 292, 299 (S.D.N.Y. 2005) ("IDEA does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP for a student.").[2]  Having reviewed the administrative record, the court determines that the PPT had adequate information to design a substantively appropriate IEP for S.  Accordingly, the court overturns the Hearing Officer's determination on this issue.

2.      Lack of Transition Program

The Hearing Officer concluded that the IEP was inappropriate on a second ground—namely, that it did not provide a transition program to facilitate S's return to Suffield Public Schools. <u>See</u> Final Decision at 12.  The court agrees and determines that the lack of such a program is a sufficient basis on which to affirm the Hearing Officer's broader conclusion regarding the substantive inappropriateness of the IEP.

At the time of the June 2011 meeting, S had been attending BBA for two years. The program at BBA is highly structured. <u>See</u> Spence Test., Hr'g Tr. (Mar. 6, 2012) at 198.  Indeed, a key factor that influenced the PPT's decision not to continue S's placement at BBA was the self-contained, highly restrictive nature of BBA, which does not provide the opportunity for S to interact with non-disabled peers. <u>See</u> Kolodziey

---

[2] In this regard, the court notes that the Hearing Officer determined—correctly, in the court's view—that there were no procedural violations.  The IDEA requires that reevaluations be performed only every three years. <u>See</u> 20 U.S.C. § 1414(a)(2)(B). Under IDEA regulations, a district requesting a reevaluation may override the parent's refusal of consent by filing for a due process hearing. <u>See</u> 34 C.F.R. § 300.300(c).  However, the district has no duty to do so.  Outside the statutory triennial evaluation requirement, declining to pursue a reevaluation does not violate IDEA procedure.  At the June 2011 meeting, the PPT relied on data from 2009. <u>See</u> B-89 at 1.  Hence, from a purely procedural standpoint, neither Suffield's failure to perform a reevaluation, nor its decision not to file for a due process hearing to override the parents' refusal of consent to the requested testing, violates the IDEA.

Test., Hr'g Tr. (Mar. 9, 2012) at 119.  Given S's unique needs, transitioning from BBA to

Suffield Public Schools would pose serious difficulties that require an appropriate

transition program.  See B-86 at 25; Ciocca Test., Hr'g Tr. (Feb. 7, 2012) at 75-76, 155.

The June 2011 IEP proposed by Suffield, however, included no such program.  See B-

89; Mrs. Y  Test., Hr'g Tr. (Dec. 14, 2011) at 99; Kolodziey Test., Hr'g Tr. (Mar. 12,

2012) at 82-83.

       The administrative record unambiguously supports the Hearing Officer's

determination that the IEP is substantively inappropriate on this basis.  Suffield points to

no evidence contradicting that determination.  Rather, Suffield argues that, because the

summer of 2011 is covered by the parties' Settlement, the Hearing Officer could not

consider this period in determining the appropriateness of the IEP for the 2011-2012

school year.  See Pl.'s Mem. at 10; Pl.'s Reply in Further Supp. of Pl.'s Mot. (Doc. No.

51) at 4-5.  That argument misses the forest for the trees.  The question is not whether

the parents could sue Suffield, under the IDEA, for failure to provide S with ESY

services during the summer in question.  The question is whether failure to offer any

transition program—in the summer, at the start of the school year, or otherwise—makes

the IEP substantively deficient.[3]  On the court's review of the record, the preponderance

of the evidence establishes that, without such a program, S is unlikely to make

meaningful progress in Suffield's school and is likely to regress upon leaving BBA.  See

_____

    [3] Suffield is obviously correct that the Settlement covered ESY services for the 2010-2011,
including the summer prior to S's proposed return to Suffield's school.  It would doubtless, therefore, be
problematic to require the district to provide an additional summer program, when the Settlement already
entailed payment for ESY services.  Nevertheless, the substantive adequacy of an IEP must be judged
based on the likelihood that S would make meaningful progress.  That determination is independent of
how the parties chose to settle prior IDEA claims.

B-86 at 25; Kolodziey Test., Hr'g Tr. (Mar. 12, 2012) at 82-83; Ciocca Test., Hr'g Tr. (Feb. 7, 2012) at 155; Final Decision at 12.

S plainly requires a transition program of some sort, and the lack of such a program plainly renders the June 2011 IEP inappropriate.  However, which program will be appropriate at which point in the school year is a determination better left, in the first instance, to the PPT.  To the extent that the Hearing Officer determined the IEP to be inappropriate in light of the lack, specifically, of ESY services in the summer of 2011, see Final Decision at 12, his determination is modified to reflect the broader reason that the IEP was inappropriate in light of the lack of an appropriate transition program and, as modified, is affirmed.

      C.      Appropriateness of Unilateral Placement at BBA

"Once it is determined that the program offered by an IEP will not enable the child to receive educational benefits, the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate."  M.H., 685 F.3d at 252 (citations and internal quotation marks omitted).  Unlike IEPs provided by public schools, the parents' unilateral placement need not provide FAPE, as defined by the IDEA.  Id.  However, such placement must still be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 207.   Thus, although a private placement need not furnish every service necessary to maximize the child's potential, see Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 365 (2d Cir. 2006), to be eligible for reimbursement, the parents must have unilaterally placed their child in a program "specifically designed to meet [his] unique needs," Gagliardo, 489 F.3d at 115 (citations and internal quotation marks omitted).

17

The record demonstrates that BBA was not specifically designed to meet S's unique needs.  Rather, BBA met some of S's unique needs, such as his need for a structured language-rich learning environment, while not addressing others, such as S's needs for additional mathematics instruction, supplemental social skills training, and related services in speech, occupational, and physical therapy.  See B-73 at 30; B-86 at 26; B-87; B-100 at 7; B-102 at 3; B-103 at 2; and B-104 at 2.  Although BBA admits students with broader disabilities, it specializes in—and has greatest success—assisting students of average or above average intelligence with language processing issues, such as dyslexia.  See Spence Test., Hr'g Tr. (Mar. 6, 2012) at 18-19.  S, who does not fit BBA's model population, nevertheless receives the standard program available at BBA, with no documented modifications.  See id. at 164-65.

On the court's review of the entire administrative record, the preponderance of evidence supports the Hearing Officer's determination that S's marked progress in some areas, like reading, on which BBA's instructional program focuses, was accompanied both by little progress in mathematics, see B-86 at 20, 22, 26; B-87, and by regression in some areas of speech and language, see B-66; B-100.  See Final Decision at 9, 12-13.  S has a recognized need for the services of a speech pathologist.  See B-100 at 7; Sewall Test., Hr'g Tr. (Mar. 12, 2012) at 176-78, 215-17.  Likewise, the most recent available mathematics assessment confirms S's need for additional support.  See B-86 at 26; Ex. 3 to Mot. to Supplement R. (Doc. No. 38-4).  These services are not provided to S at BBA.  See Final Decision at 6, 9; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 87; Spence Test., Hr'g Tr. (Mar. 6, 2012) at 98, 124-26.

In addition, BBA provides a highly restrictive environment with no opportunity for S to interact with non-disabled students.  See Spence Test., Hr'g Tr. (Mar. 6, 2012) at 198; Kolodziey Test., Hr'g Tr. (Mar. 9, 2012) at 119.  Although a unilateral private placement is not subject to the same statutory LRE requirements as a public school placement, the IDEA's strong preference for children with disabilities to receive a mainstream education to the maximum extent possible remains a pertinent factor in determining the appropriateness of a unilateral placement.  See M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 105 (2d Cir. 2000), abrogated on other grounds, Schaffer v. Weast, 546 U.S. 49 (2005); see also Muller on Behalf of Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist., 145 F.3d 95, 105 (2d Cir. 1998) ("[T]he presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students.").  Moreover, after observations of S conducted at BBA, the neuropsychologist retained by the parents, Dr. Ciocca, concluded that social skills development remains an area of need for S and that S would benefit from interaction with non-disabled peers. See Ciocca Test., Hr'g Tr. (Feb. 7, 2012) at 135-36.

Relying on testimony by BBA's Executive Director, the parents argue that all of S's needs were met at BBA and that S made progress in all areas.  See Defs.' Reply in Further Supp. of Defs.' Mot. (Doc. No. 52) at 3-4; Spence Test., Hr'g Trans. (Mar. 6, 2012) at 98-105, 196-97.  Whether S's unique needs are being met at BBA is a question requiring relevant expertise in the substantive areas of need.  At the due process hearing, Suffield's speech pathologist testified, based on her assessment of S, that S would not receive FAPE without the services of a certified speech and language

pathologist.  See Sewall Test., Hr'g Tr. (Mar. 12, 2012) at 176-78, 215-17.  Neither Dr. Spence nor Dr. Ciocca is a speech pathologist qualified to testify that S's need for speech therapy is met by the program provided to S at BBA.  See Spence Test., Hr'g Tr. (Mar. 6, 2012) at 185-88; Ciocca Test., Hr'g Tr. (Feb. 7, 2012) at 85.  No comparable expert testified, based on personal observation of S at BBA, that S's established need in this area is being met.[4]  The parents have, thus, failed to carry their burden.

As is evident from the record, the parents feel strongly that Suffield's public education system has failed S and will continue to do so and that BBA has provided a learning environment in which S can thrive, both socially and academically.  See Defs.' Mem. at 7-10, 26-34; Mrs. Y Test., Hr'g Tr. (Dec. 14, 2011) at 60-61, 80-86, 99-100, 123-24.  Even when combined with the parents' own feeling that BBA is the best option for their son, the objective evidence of progress in some subjects is not a sufficient evidentiary basis for the court to displace the Hearing Officer's determination that the program is not designed to meet S's documented needs in a variety of other areas.

Because the preponderance of the evidence in the administrative record supports the conclusion that BBA is not an appropriate unilateral placement for S, the court affirms both the Hearing Officer's Final Decision on this issue and his determination that the parents are, accordingly, not entitled to tuition reimbursement. See M.S., 231 F.3d at 102.

D.   Remedy

---

[4] Even if the parents had brought forward an expert who offered conflicting testimony with respect to S's need for speech therapy, the Hearing Officer's determinations regarding substantive adequacy and educational methodology are entitled to particular deference. M.H., 685 F.3d at 240, 244 ("District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." (citation, alterations, and internal quotation marks omitted)).

Courts have substantial discretion under the IDEA to award appropriate relief. See 20 U.S.C. § 1415(i)(2)(C); Carter, 510 U.S. at 15-16.  Both parties object, albeit for different reasons, to the specific relief ordered by the Hearing Officer—namely, that Suffield would convene a PPT meeting and provide at least six weeks of ESY services to S during the summer of 2012.  See Final Decision at 14; Defs.' Mem. at 37-39; Pl.'s Mem. at 11, 28.  Suffield objects that any determination regarding ESY services in the summer of 2012 was beyond the scope of the hearing and that such a determination was premature because the PPT had not yet reviewed S's progress in the 2011-2012 school year.  See Pl.'s Mem. at 28.  The parents object that the Hearing Officer's remedy was, in effect, no remedy because they were left to the same PPT process, with the same prospect of S's attending Suffield Public Schools, that they allege to have demonstrably failed S in the past.  See Defs.' Mem. at 37-39.

During the pendency of the present litigation, the appropriateness of the specific relief ordered by the Hearing Officer has become moot in light of the lapsed time period for compliance.  The court, therefore, vacates that part of the Final Decision and proceeds to address what constitutes appropriate relief where, as here, the district has not provided FAPE, yet the parents' unilateral placement is also inappropriate.

As the Supreme Court held in Carter, Congress intended for IDEA's promise of FAPE to children with disabilities "normally [to] be met by an IEP's provision for education in the regular public schools or in private schools chosen jointly by school officials and parents."  510 U.S. at 12.  The remedy of tuition reimbursement is available in the atypical case, where an IEP fails to deliver FAPE, and having rejected the IEP, the parents place their child in an appropriate private alternative.  See Frank G., 459

F.3d at 363 (citing Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.,
471 U.S. 359, 370 (1985)).  The discretionary nature of IDEA's reimbursement remedy,
which requires courts to consider the pertinent equities, id. at 363-64, indicates
Congress's strong preference for children to receive FAPE through a cooperative IEP
process and for district funds to be directed toward unilateral parent placements only in
the unusual case, where the process breaks down.  Carter, 510 U.S. at 12.

Consequently, Suffield's failure to provide FAPE is a necessary, but not the sole,
condition for tuition reimbursement.  Because, in the court's view, BBA is not designed
to meet S's unique needs, reimbursement is not appropriate relief.  See Frank G., 459
F.3d at 363.[5]  Nor is the other specific relief sought by the parents—that is, an order
directing placement at BBA—appropriate under these circumstances.  Like tuition
reimbursement, an injunction directing Suffield to place S at BBA is an extraordinary
remedy in equity.  Where, as in the present case, the parents have not shown that their
preferred placement is appropriate, such relief is improper.  See Burlington, 471 U.S. at
370 (1985) (discussing prospective injunctive relief).

The substantive deficiency of the June 2011 IEP, while not negligible, does not
implicate the ability of S ever to receive FAPE in Suffield Public Schools.  In determining
that the IEP was inappropriate, the Hearing Officer rested his determination on two
grounds: (1) the PPT lacked adequate information; and (2) the IEP lacked a transition
program.  In affirming the Hearing Officer's determination, the instant Ruling further

---

[5] While S has been enrolled in BBA since 2009, reimbursement under the IDEA's "stay-put"
provision is unavailable because, as part of the 2009 Settlement, the parties agreed that Suffield had no
"stay-put" obligations related to the parents' unilateral placement at BBA after August 2011.  B-76 at 1;
see 20 U.S.C. § 1415(j); Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist., 386
F.3d 158, 160-61 (2d Cir. 2004).  Indeed, the parents assert no such claim in the present action.

limits the substantive defect to only the second of these two grounds.  In such circumstances, a proper remedy is an award of specific relief directing the district to provide those educational services lacking in the IEP—namely, an appropriate transition program.

Nothing in the record suggests that Suffield is incapable of providing such a program or is otherwise unable to service S's needs in the context of a partly mainstreamed public education.  While, understandably, the parents have firm views about the optimal learning and social environment for their child, the judicial relief sought by the parents is only merited in cases where appropriate unilateral placement follows a district's failure to provide FAPE.  Based on its review of the record, the court concludes that this is not such a case.

## V.  CONCLUSION

For the reasons set forth above, the court **GRANTS in part and DENIES in part** plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 43) and **DENIES** defendants' Motion for Summary Judgment on the Administrative Record (Doc. No. 44). The Clerk is hereby directed to close the case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 7th day of January, 2014.

/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge